IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| **KENNETH KENITZER,**<br><br>                      Plaintiff,<br><br>v.<br><br>**RELIASTAR LIFE INSURANCE COMPANY, ET AL.,**<br><br>                      Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:09CV599DAK |

      This matter is before the court on cross motions for summary judgment filed by Plaintiff Kenneth Kenitzer and Defendant Reliastar Life Insurance Company. After the motions were fully briefed, the court held a hearing on the motions on December 21, 2010. At the hearing, Plaintiff was represented by Brian S King, and Defendant was represented by William D. Hittler and Ralph C. Petty. The court took the motions under advisement. Having fully considered the motions, memoranda, affidavits, and exhibits submitted by the parties as well as the facts and law relevant to this motion, the court enters the following Memorandum Decision and Order.

## BACKGROUND

      In this case, Plaintiff Kenneth Kenitzer has appealed Defendants' denial of disability benefits. Reliastar Life Insurance Company is the insurer and plan administrator for Kenitzer's former employer, The Canopy Group. Kenitzer began working for the Canopy Group as its

Director of Infrastructure Recovery in July 2004. He supervised a department responsible for managing backup and recovery of software and computer data.

On August 18, 2006, Kenitzer was in a car accident and incurred neck and back pain. After Kenitzer's car accident, he continued working sporadically until November 26, 2006. On that date, he submitted a claim for plan benefits to Reliastar. His claim for disability benefits was approved and became effective on February 27, 2007, after the 90-day benefit waiting period ended.

Kenitzer went to several doctors after his car accident. Kenitzer's doctors verified that he was not capable of performing his own work activities. Kenitzer went to Dr. Richard Rosenthal and Nexus Pain Care, who referred him to Dr. Pratte. He was then referred for a neurosurgical consultation with Matthew Badger, MSN. Mr. Badger noted that the MRI scans revealed a herniated disc at C5-6 and congenital short pedicle syndrome. Badger reviewed his findings with Dr. Gaufin, a neurologist in his office, who recommended surgery to decompress the herniated disc.

Kenitzer was next seen by Dr. Stuart King at the Utah Physiatry Associates clinic on November 27, 2006. Dr. King advised Kenitzer to stop working. Kenitzer was subsequently treated by Valton King, D.O. ("Doctor of Osteopathic Medicine"). Kenitzer saw King on December 14, 2006, and discussed the risks involved with spinal manipulation in his case. Kenitzer, however, wanted to avoid surgery if possible and opted for the spinal manipulation treatment with King.

On January 2, 2007, Canopy terminated Kenitzer's employment because "[w]ith the injuries sustained in his accident he was no longer able to perform the tasks associated with his

job." Kenitzer applied for long-term disability benefits at that time. The long-term disability policy provides coverage for Canopy employees when, because of an accident or injury, they become unable to work.

To qualify for benefits under the Policy, the claimant must be insured on the date of disability, send written notice of the disability, and be receiving "regular and appropriate care and treatment." "Regular and appropriate care" is defined in the Policy as:

> – You personally visit a doctor as often as is medically required, according to generally accepted medical standards and consistent with the stated severity of your medical condition, to effectively manage and treat your sickness or injury.
>
> – You are receiving care which conforms with generally accepted medical standards for treating your sickness or injury and is consistent with the stated severity of your medical condition.
>
> – Care is rendered by a doctor whose specialty or experience is the most appropriate for your disability according to generally accepted medical standards.
>
> – You are receiving or actively seeking appropriate physical or psychological rehabilitative services.

The definition of "disability, disabled" in the Policy states:

> ReliaStar Life's determination that a change in you functional capacity to work due to accidental injury or sickness has caused the following:
>
> – During the benefit waiting period and the following 24 months, your inability to perform the essential duties of your regular occupation and as a result you are unable to earn more than 80% of your indexed basic monthly earnings,
>
> – After 24 months of benefits, your inability to perform the essential duties of any gainful occupation, and as a result you are unable to earn more than 60% of your indexed basic monthly earnings.

On January 10, 2007, Kenitzer again saw King, who noted that he had not reached

maximum medical improvement at that point. Kenitzer returned to King's office on January 18, 2007, and reported that he felt he was making progress although he was still experiencing pain. Kenitzer saw King again on January 24, 2007. King encouraged Kenitzer to be active but careful with his activities. He also encouraged Kenitzer to look for employment but did not believe that Kenitzer would be in a position to return to work until approximately May 1, 2007. Kenitzer met again with King on February 13, 2007, and reported that he was exercising as King had recommended but he was frustrated by his accident-related injuries. King gave Kenitzer further instructions about activities to avoid and asked Kenitzer to come in for further treatment. Kenitzer, however, did not return to see King until January 28, 2008, almost a year later.

On March 5, 2007, Kenitzer saw Mr. Badger again at the Utah Neurological Clinic. Badger, who works with Dr. Gaufin, told Kenitzer that he had three options–surgery, continuing treatment with King, or extensive physical therapy. Dr. Gaufin asked to see Kenitzer again, but Kenitzer did not return.

On March 28, 2007, Reliastar's internal logs include an inquiry as to whether or not Kenitzer was receiving "appropriate care and treatment." The conclusion was yes. Even though Kenitzer had not pursued surgery as recommended by Dr. Gaufin, he had followed through with every other treatment tactic and recommendation to date. At the time of that review, there appeared to be no lapse in treatment.

On April 10, 2007, Kenitzer received a favorable decision from Reliastar on his long-term disability application. Under the terms of the policy, he was entitled to 66.67% of his gross monthly income, totaling $3,466.84 monthly. In connection with receiving the benefits, Reliastar included a "Reimbursement Agreement" and a "Social Security Consent" to offset any potential

social security disability benefits Kenitzer might receive.

On July 12, 2007, Carla Wagner, a Senior Disability Benefits Specialist for Reliastar, sent a letter to Kenitzer noting that the Policy required that he "must be receiving regular and appropriate care and treatment to be eligible to receive long term disability benefits." The letter also stated that two case managers had been unable to contact Kenitzer by telephone and that he had not responded to three written requests for additional information relating to his accident and application for Social Security benefits.

Kenitzer contacted Reliastar and explained that following his termination from Canopy, he had no health insurance, no income, his wife was pregnant, and his home was in foreclosure. Because of his serious financial problems, Kenitzer stated that he was unable to see his treating physicians regularly. Reliastar does not appear to directly dispute this information but states that there is no information in the record that Kenitzer while receiving his long-term disability benefits could not afford to see his doctors. He had begun receiving disability benefits at that time.

As part of its ongoing evaluation of Kenitzer's claim, Reliastar arranged an independent medical examination ("IME") to take place on November 15, 2007. Kenitzer did not appear at the evaluation. The IME was rescheduled for December 14, 2007, and Kenitzer was informed that his benefits would be placed on hold until he completed the IME. Kenitzer attended the IME on December 14, 2007, with Dr. Aubrey Swartz, a specialist in orthopedic surgery. Reliastar did not provide Dr. Swartz with specifics regarding the Policy, but asked Dr. Swartz to answer several specific questions in relation to Kenitzer's condition.

Following the IME, Dr. Swartz prepared a written report responding to the questions

posed by Reliastar. Dr. Swartz noted the disk herniation but stated that there was no evidence of spinal cord compression or nerve root compression. Dr. Swartz found Kenitzer to be "markedly depressed, which appeared to be the primary driving force with respect to his claim for disability." Dr. Swartz concluded that Kenitzer's care and treatment was not appropriate in view of his medical history, noting that the medical records did not indicate any objective neurological findings and no specific evidence of myelopathy or radiculopathy. Dr. Swartz further stated that King's osteopathic biomedical assessment was intended to look for somatic dysfunction and mal-alignment which is different than a standard medical evaluation. Dr. Swartz recommended that Kenitzer receive care for chronic depression and for management of chronic pain. He found that Kenitzer's prognosis was favorable and that he had reached maximum medical improvement. Dr. Swartz found Kenitzer capable of sedentary wok activities with restricted hours.

Reliastar sent Dr. Swartz's IME report to Kenitzer's treating physicians. None of the physicians responded. On January 28, 2008, Kenitzer returned to see King, which was his first visit since February 13, 2007. On February 14, 2008, Reliastar wrote to Kenitzer advising him that it had been determined that the medical documentation received did not support his claim of continuing disability under the Policy. Reliastar referred to the results of Dr. Swartz's IME concluding that he was not functionally impaired and also relied on the fact that Kenitzer had not received "regular and appropriate care" as required under the Policy. Kenitzer had not received medical treatment from March 2007 onward. At that time, Reliastar was not aware that Kenitzer had gone back to see King on January 28, 2008. In any event, Reliastar stated it was discontinuing Kenitzer benefits as of December 26, 2007 and notified him of the opportunity to appeal the decision.

6

On August 12, 2008, Kenitzer appealed Reliastar's decision to terminate benefits. Along with the appeal, Kenitzer submitted additional medical records of doctor's visits that he had since his benefits were terminated. He included the following records: January 28, 2008 visit with King; March 11, 2008 MRI; April 14, 2008 visit with King; Spinal Rehab Specialist Patient Day Sheets with dates of service May 28 and 30, 2008; and a letter and medical opinion from King, dated August 7, 2008.

King's August 2008 letter stated that Dr. Swartz incorrectly assumed that the primary cause of Kenitzer's complaints was chronic depression; that Swartz incorrectly found that the lack of any MRI or other imaging test results meant that he had no true injury; that he believed spinal manipulation treatment was appropriate treatment; and that he believed Kenitzer was not able to perform his job as of December 2007. King diagnosed Kenitzer with: C5-6 disk herniation; early findings of myleopathy (arm numbness); cervical and thoracic sprain syndrome and multiple region somatic dysfunction; lumbar strain syndrome; tension headaches; and reactive depression.

In addition to disagreeing with Dr. Swart's medical findings and finding it erroneous that Reliastar would rely on an IME, Kenitzer's appeal focused on his disagreements that the mental and emotional demands of his job were ignored in determining his capacity to perform his occupation. Kenitzer also asserted that although the policy requires regular and appropriate care as a prerequisite to eligibility benefits, he could not continue with regular doctor visits when he had no income.

The appeals committee responded that Kenitzer had obtained no psychiatric treatment to give relevant information about the mental and emotional toll of his injuries on his ability to

perform his occupation. In addition, although Kenitzer has asserted that Reliastar ignored his depression, Reliastar's response was again that Kenitzer had not sought any psychiatric or other treatment for depression. The committee disagreed with Kenitzer's characterizations of Dr. Swart's IME report. The committee noted that even King had noted that Kenitzer may be able to obtain a work release in May 2007. Kenitzer, however, had discontinued his treatment with King well before that date. With respect to Kenitzer's failure to continue regular care and treatment, the appeal committee noted that Kenitzer was being paid benefits during that time frame and was receiving correspondence from Reliastar that such treatments were necessary to keep his benefits. The appeals committee concluded that if Kenitzer had continued to receive regular and appropriate case as defined in the Policy, he may have been released to work in May 2007 as anticipated by Dr. King.

On September 11, 2008, the Reliastar appeals committee upheld the initial determination to terminate Kenitzer's benefits as of December 26, 2007, finding that Kenitzer no longer met the definition of total disability and that he was not under regular and appropriate care from March 5, 2007 to that time.

Eight months later, Kenitzer filed a request for a voluntary appeal. His counsel transmitted Reliastar a copy of a favorable decision from the Social Security Administration on his claim for disability benefits. The Social Security Administration found Kenitzer totally disabled as of October 31, 2006. Kenitzer also included a functional capacity evaluation that Dr. King had filled out from July 2, 2008, that apparently was not presented in the first appeal.

The Reliastar appeals committee agreed to consider Kenitzer's appeal and assembled a committee of Reliastar employees who had not considered Kenitzer's first appeal. A month

later, the new appeals committee concluded that the new information did not change the committee's previous decision. Specifically, the committee noted that the appeal did not provide any evidence that Kenitzer was under "regular and appropriate care" as required by the Policy.

## DISCUSSION

In their respective cross motions for summary judgment, Kenitzer argues that Reliastar wrongfully denied his claim for disability benefits whereas Reliastar argues that the Plan Administrator's decision denying benefits should be upheld. The parties also dispute the applicable standard of review, which the court will address prior to reaching the merits.

### I. Standard of Review

The parties dispute whether the case should be reviewed under a de novo or arbitrary and capricious standard. ERISA itself does not specify the standard of review that should be used. However, the United States Supreme Court has held that a denial of benefits challenged under ERISA, "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When the plan grants discretionary authority to the administrator, the denial of benefits is reviewed under the "arbitrary and capricious" standard. *Chambers v. Family Health Corp.*, 100 F.3d 818, 825 (10th Cir. 1996).

#### A. Plan Documents and Discretion

As an initial matter in this case, the parties disagree what documents constitute the Plan. Reliastar has provided an affidavit from a Reliastar employee stating that the Plan consists of several interrelated documents. The employee explains that the Reliastar Group Policy discusses

9

the relationship between Reliastar and the Canopy Group, such as the payment of premiums but it does not discuss essential provisions such as benefits eligibility and calculations. That information is contained in the second plan document, ReliaStar's Insurance Certificate. The Certificate is printed in a 26-page booklet entitled "Your Group Disability Insurance Plan." This booklet is distributed to Canopy employees. The last section of the Certificate contains the Plan's Summary Plan Description ("SPD"). The SPD states that Reliastar "has final discretionary authority to determine all questions of eligibility and status and to interpret and construe the terms of this policy(ies) of insurance." The Group Policy by reference makes clear that the insurance contract includes the Certificate's terms.

Kenitzer seems to contend that the SPD cannot be considered part of the Certificate even though it is in the same booklet because the SPD is, by definition, a summary of other plan documents. Kenitzer claims that it is well established that discretionary language must appear in both the document establishing the ERISA plan and the SPD in order for an abuse of discretion standard of review to apply. *Chiles v. Ceridian*, 95 F.3d 1505, 1515-18 (10th Cir. 1996). Kenitzer also argues that an SPD may not unilaterally create rights not in the Plan.

Unlike many other cases, however, the documents in this case specifically incorporate the terms of the other documents to form a single Plan. While Kenitzer states that *Chiles* requires discretionary language to be in both the ERISA plan and SPD, *Chiles* actually states that "SPDs are considered part of the ERISA plan documents" and that when interpreting a plan it is necessary to "examine the plan documents as a whole." 95 F.3d at 1511. There is nothing in *Chiles* that would prohibit an insurer from incorporating the terms of an SPD into other plan documents. In this case, the SPD, as part of the Certificate, is incorporated into the Group

Policy. Even if Kenitzer was correct that the discretion had to be present in both the Group Policy and the SPD, the discretion in this case is in the SPD and the Group Policy incorporpates its terms. Thus discretion would still be conferred.

Under Tenth Circuit precedent, the SPD is a plan document and can control the terms of the plan. *Chiles* holds that "[b]ecause the SPD best reflects the expectations of the parties to the plan, the terms of the SPD control the terms of the plan itself." *Id.* at 1515. Thus, even if a conflict did exist between the SPD and the other plan documents, which is not the case because the Group Policy incorporates the Certificate, the SPD, which undeniably grants discretion, would still control under Tenth Circuit law. The SPD was part of the Certificate and distributed to employees in a booklet entitled "Your Group Disability Insurance Plan." This booklet was obviously intended to inform participants of their rights under the Plan. Therefore, the court concludes that discretion was conferred under the Plan.

Kenitzer's authority from other circuits is distinguishable. In *Jobe v. Medical Life Ins. Co.*, 598 F.3d 478, 479-80 (8th Cir. 2010), the policy contained a clause stating that it was a complete contract and the Certificate, which included the SPD, contained a disclaimer that the right to any benefit was controlled by the policy and no rights arose out of the SPD. The *Jobe* court held that an employee examining the documents would find that they consistently stated that the policy would control in case of conflict. *Id.* Because the policy did not grant discretion, the de novo standard of review applied. *Id.* But, in this case, the Group Policy expressly incorporates the SPD and the SPD does not contain language stating that the SPD always yields to the policy. Accordingly, *Jobe* is not on point.

Kenitzer also relies on *Schwartz v. Prudential Ins. Co.*, 450 F.3d 697 (7th Cir. 2006),

where the court found that de novo review applied when the SPD granted discretion but the plan did not. The *Schwartz* court presumed that where the plan and SPD conflict, the plan will control because it is the more complete document. *Id.* at 699. That position is at odd's with the Tenth Circuit's holding in *Chiles*.

Finally, Kenitzer cites to *Woods v. Prudential Ins. Co.*, 528 F.3d 320 (4th Cir. 2008). In that case, however, the parties agreed that the SPD was not relevant and the holding solely examined the language of other plan documents. *Id.* at 322 n.3. Here, there is no such agreement.

### B.  Separate Entity

Kenitzer also challenges whether another entity processed and evaluated Kenitzer's claims. Kenitzer notes that documents state ING, but it is unclear of the function and relationship of ING to Reliastar. Reliastar responds that Reliastar was the entity that considered and decided Kenitzer's benefits claim. Several years ago, Reliastar's ultimate parent company became ING Groep, N.V., through a merger of holding companies that included Reliastar's immediate parent. Reliastar became part of the ING group of corporations and ING logos appear on some of Reliastar's documents for marketing purposes. However, as established by an affidavit submitted by a Reliastar employee, the employees who decided Kenitzer's claim were Reliastar employees. The employee confirms that there is no such entity as "ING Employee Benefits Disability Management Services." Therefore, the court finds no basis for Kenitzer's concerns regarding a separate entity making the decisions.

### C.  Conflict of Interest

Finally, Kenitzer contends that if this court determines that Reliastar is entitled to an

abuse of discretion standard of review, Reliastar's conflict of interest together with significant procedural irregularities call for a significantly reduced degree of deference in this court's review. The Tenth Circuit has said that although the arbitrary and capricious standard requires the court only to ask whether the interpretation of the plan was reasonable and made in good faith, court's dial back deference "if 'a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest.' In such a situation, that 'conflict should be weighed as a factor in determining whether there is an abuse of discretion.'" *Weber v. G.E. Life Assur. Co.*, 541 F.3d 1002 (10th Cir. 2008). The Tenth Circuit still applies its sliding scale approach where "the reviewing court will always apply an arbitrary and capricious standard, [but] will decrease the level of deference given . . . in proportion to the seriousness of the conflict." *Id.*

Kenitzer argues that the same inherent structural conflict of interest is present as existed in *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008). Reliastar acknowledges that it is both the maker of claims decisions and the claims payor. In *Glenn*, the Supreme Court directed that this conflict should be considered as one of many factors by courts in determining whether an abuse of discretion occurred, but also made clear that the actual abuse of discretion standard remains unchanged. *Glenn*, 554 U.S. 105 (2008). Whether this conflict plays a major or minor role in the review depends on the circumstances of the case.

Kenitzer argues that Reliastar is an insurer competing with other insurers in an open market place and it would not exist if it consistently paid out more in claims than it collected in premiums. The court recognizes that there are pressure on Reliastar to keep its payment of claims as low as possible in order to compete successfully in its industry. The court also agrees with Kenitzer that there is little evidence in the record that Reliastar tried to mitigate the effect of

13

this structural conflict.

However, the court disagrees with Kenitzer claim that the record indicates a repeated interested in only the financial aspects of Kenitzer's claim. Reliastar sent Kenitzer forms to offset his benefits with any Social Security awards and asked for regular updates on the status of any third party liability claims that Kenitzer was asserting as a result of the automobile accident. Kenitzer contends that all this was to protect Reliastar's financial interests and is evidence that this court should decrease its level of deference. The court, however, notes that just because an entity may take steps to protect its valid financial interests, such steps do not automatically demonstrate a bias in favor of financial interests. The steps taken in this case appear to be consistent with Reliastar's valid interests and appropriate. The Policy itself provides that any benefits are subject to an offset from other income, such as Social Security or judgment from a third party. Because Kenitzer had a potential for either of these types of income, Reliastar notified him of the offset policy. Notifying Kenitzer of the policy requirements does not demonstrate bias or consitute procedural irregularities.

Kenitzer also argues that Reliastar's willingness to ignore his treating physician's opinions in favor of an IME doctor, who has a track record favoring insurers, shows that there were procedural irregularities that resulted in Reliastar's focus on its financial interests. But there is no evidence that Reliastar failed to consider the opinions of Kenitzer's treating physicians at each stage of the claim review process. Kenitzer argues that Swartz's report should be discounted because he was noted in one case to have repeatedly sided with an insurer. That case, however, did not involve Reliastar and there is no evidence in this case that Swartz's opinion was based on anything other than his examination of Kenitzer and his medical records. Moreover,

Reliastar did not ignore the findings of the Social Security Administration.  Several cases states that ERISA plan administrators are not bound by the finding of the Social Security Administration.  Reliastar is bound by the Plan, and the Plan does not allow for benefits if the claimant was not under "regular and appropriate care."  The Social Security Administration does not have a similar standard.  Therefore, a disagreement with the Social Security Administration does not, in itself, demonstrate procedural irregularities that would necessitate this court to decrease its level of deference under the arbitrary and capricious standard.

After considering each of Kenitzer's claims regarding Reliastar's conflict of interest, the court concludes that there should be a slight decrease in the deference afforded based on the fact that Reliastar decides the claims and is the claims payor.  However, Kenitzer has not demonstrated the need for a significant decrease in the level of deference.

## II.  Merits

On the merits of whether to uphold or reverse Reliastar's determination to terminate benefits, the parties dispute two main points: (1) whether Kenitzer was receiving "regular and appropriate care" as required by the Policy; and (2) whether he met the definition of totally disabled under the Policy.  If either issue weighs in favor of Reliastar, this court must uphold Reliastar's decision.  In order for this court to reverse Reliastar's decision or to send the matter back for further review, Kenitzer must show that both determinations were erroneous.

### A.  Regular and Appropriate Care

Reliastar made the determination that Kenitzer was not in compliance with the Policy's requirement that he be receiving regular and appropriate case based on the Policy language and Kenitzer's medical records.  Kenitzer does not dispute that he went from March 5, 2007 until

January 28, 2008 without any medical treatment. It is also undisputed that to the extent that Kenitzer suffered from depression, he never sought treatment for that condition.

Kenitzer argues that he could not afford to see his physicians because he was terminated form his employment and only receiving his long-term disability benefits. He also contends that the "regular and appropriate case" requirement is a technical requirement in the Policy that is unfair to enforce. Reliastar cites to Tenth Circuit cases in which the court found that an employee's lack of regular care was a valid basis for denying a claim. *See Te'o v. Morgan Stanley & Co.,* 311 Fed. Appx. 165, 2009 U.S. App. LEXIS 2770 at *2-3, 8-9, 12 (10th Cir. Feb. 11, 2009) (unpublished) (insurer's denial of claim based on employee's lack of regular care from a physician deemed to constitute a reasonable basis for denying claim); *Metzger v. UNUM Life Ins. Co.*, 476 F.3d 1161, 1168-69 (10th Cir. 2007) (insurer's decision to deny claim because employee was not under the regular care of a doctor upheld); *see also Hoskins v. Bayer Corp.*, 362 Fed. Appx. 750 (9th Cir. Jan. 10, 2010) (no abuse of discretion in terminating benefits where claimant did not receive treatment during 11-month period) (unpublished).

Kenitzer argues that his lag in treatment was based only on his financial circumstances and was not in bad faith. Kenitzer states that he told Reliastar that he could not afford regular treatment. After his employment was terminated, he had no health insurance and he claims that the payments he received from Reliastar were not enough to allow him to keep up the obligations he had to support his family. Although it may appear that he re-commenced treatment after the IME was conducted in order to keep his benefits, Kentizer states that this timing also coincided with when he qualified for Medicaid.

Kenitzer cites to the Third Circuit, which has ruled that where financial circumstances

16

cause a temporary cessation of medical treatment by the claimant, this alone does not provide a valid basis to deny disability benefits. *Skredtvedt v. E. I. DuPont De Nemours*, 268 F.3d 167, 182 (3rd Cir. 2001). Kenitzer then asserts that the Tenth Circuit has refused an insurer's attempt to cut off ERISA disability benefits as a result of a temporary lapse of regular care of a doctor when the lapse is caused by a lack of financial resources. *Gaylor v. John Hancock Mut. Life Ins. Co.*, 112 F.3d 460, 467 (10th Cir. 1997).

In *Skredtvedt*, however, the claimant was not receiving any benefits at all. Therefore, it appears to be distinguishable because the claimant had no income at all. In this case, Kenitzer was receiving 66% of his monthly income. Moreover, the case cannot overrule Tenth Circuit law acknowledging the right of an administrator in an ERISA-governed plan to terminate benefits where, after a considerable period of time (10.5 months), a claimant does not follow up with requests from his physicians and disengages in the process. *See Te'o*, 311 Fed. Appx. 165; *Metzger*. 476 F.3d at 1168-69. In this case, at least two of Kenitzer's physicians asked to see him back within weeks and he did not return for treatment for nearly a year.

*Gaylor* also appears to be distinguishable. In *Gaylor*, the court held that the plaintiff's visit to a doctor just over three months from her last visit was consistent with the insurer's guidelines in interpreting its "under a doctor's care" requirement because it prescribed a six-month time period for chronic conditions. 112 F.3d at 467. The court mentioned that the claimant could not afford to see a doctor. In contrast, Kenitzer has not provided any proof that he could not afford to see any of his doctors for eleven months. While he states that his wife was pregnant and his home was in foreclosure, he was receiving a fairly sizeable benefit payment each month.

Kenitzer further argues that if the court relies on Dr. Swartz's opinion, he did not need any medical treatment during the time he failed to receive treatment. Dr. Swartz, however, did not opine that Kenitzer was in need of no treatments for his back. Dr. Swartz identified several types of appropriate treatments for Kenitzer. There is also no support in the record for Kenitzer's new argument that none of his treating physicians identified specific medical treatment to alleviate his condition. On March 5, 2007, Dr. Gaufin and Nurse Practitioner Badger met with Kenitzer and suggested that he have surgery, or follow up with King, or try extensive physical therapy. Dr. Rosenthal, who met with Kenitzer on September 20, 2006, recommended that Kenitzer meet with a psychologist, continue his medications, and follow up with another office visit. Dr. King referred to overall treatment recommendations and requested Kenitzer to return for reevaluation after his February 13, 2007 visit. Therefore, there is no basis in the record for asserting that Kenitzer was not in need of further care during the period.

Kenitzer's argument that the "regular and appropriate care" requirement is an unfair technicality to enforce is also unpersuasive. The record indicates that King told Kenitzer that if he continued with his treatments, he may be able to reach his maximum medical improvement and return to work by May 2007, which was only about four more months more of treatment. Kenitzer, however, discontinued treatment shortly thereafter in February 2007. The court does not view it as an unfair technicality for a disability benefits plan to require claimants to properly treat their conditions and try to return to work. It is in the claimants best interest to reach maximum medical improvement. Some lingering conditions may require less frequent treatment. But, in this case, there is evidence in the record that continuing treatment may have allowed Plaintiff to return to work. Therefore, the court concludes that Reliastar's determination to

18

terminate benefits based on Plaintiff's failure to comply with the "regular and appropriate care" requirement was reasonable.

## B. Totally Disabled

Because the court has concluded that Reliastar's determination to terminate benefits can be upheld based on Kenitzer's failure to comply with the "regular and appropriate care" requirement, it is not necessary to address the total disability issue. Although Reliastar appears to have relied more heavily on Dr. Swartz's opinion than on Kenitzer's treating physicians' opinions, the court notes that at the time Reliastar made its initial decision to terminate benefits, Kenitzer had not been seen by his treating physicians for a significant period of time. In addition, Reliastar provided Kenitzer's treating physicians with the IME report and they did not comment. The record appears to show that on the two appeals of the initial decision to terminate benefits Reliastar increasingly relied on Kenitzer's failure to comply with the regular and appropriate care requirements. But, there is no evidence that Reliastar ignored Dr. King's opinion or the Social Security Administration's determination of disability. Moreover, there is no requirement that an ERISA plan administrator must follow either.

Furthermore, the court finds no irregularity in Reliastar's procedural handling of the IME merely because Reliastar did not give Swartz the policy requirements and instead asked him to answer general questions regarding Kenitzer's condition. It was Reliastar's role and responsibility to apply the information regarding Kenitzer's condition to the policy requirements in making its claims decision. The court, therefore, is not persuaded that Kenitzer has shown a reversible error in Reliastar's determination of the disability issue. The court, however, has already upheld Reliastar's decision on other grounds and does not address the disability issue

fully.

## CONCLUSION

Based on the above reasoning, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED. The Clerk of Court is directed to close the case. Each party shall bear its and his own fees and costs.

DATED this 18th day of January, 2011.

BY THE COURT:

_____
Dale A. Kimball,
United States District Judge